IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

ALONZO ECHOLS

       Plaintiff,

       v.                               Case No.  04-2484 JWL

UNIFIED GOVERNMENT OF

WYANDOTTE COUNTY, KANSAS CITY,

KANSAS, et al.,

       Defendants.

_____

## MEMORANDUM AND ORDER

       This case concerns a claim by plaintiff ("Mr. Echols") against the Unified Government of Wyandotte County, Kansas City, Kansas ("Unified Government") and several of its law enforcement officials who allegedly prolonged Echols's wrongful detainment by failing to investigate a mistake in identify between the plaintiff and someone with a virtually identical name, Alonzo Eacholes ("Mr. Eacholes").   Despite his insistence that they had improperly detained him for the second time on the same mistake, Mr. Echols remained in the Wyandotte County Detention Center ("WCDC") for 25 days in October and November 2003 until he was

released.  He has alleged a constitutional violation under 42 U.S.C. § 1983, as well as Kansas

state law claims of false imprisonment and intentional infliction of emotional distress.[1]

This matter is currently before the court on the motion for partial summary judgment

(doc. # 50) by defendants Unified Government, Leroy Green ("Mr. Green"), Ron Miller ("Mr.

Miller"), Gerald Buckner ("Mr. Buckner"), Chad Gilbert ("Mr. Gilbert"), and John Russell

("Mr. Russell") and the  motion for summary judgment (doc. # 53) by defendant Rick Martin

("Mr. Martin").  For the reasons explained below, the defendants' motions  are granted.

## STATEMENT OF MATERIAL FACTS

In February 2000, Kansas City, Kansas, police officers executed five bench warrants

for misdemeanors and a state felony warrant for aggravated battery against the plaintiff, Mr.

Echols, who was born February 4, 1965.  He was arrested because his name and birth date

mistakenly were listed on the warrants.   The warrants should have been issued for Mr.

Eacholes, born August 1, 1973.  The two men, Mr. Echols and Mr. Eacholes, have no similar

characteristics beyond their names.  Nonetheless, the police took Mr. Echols to the Wyandotte

County Detention Center ("WCDC") and booked him on the warrants.  Mr. Echols maintained

his innocence but remained in jail for 18 days until March 8, 2000, when the district court

dismissed the felony charge and released him.

---

[1] The Unified Government has admitted liability on the false imprisonment claim, and
that issue is not before the court.

Subsequently, Mr. Echols filed suit against the Unified Government and various law enforcement officials, see Case No. 01-2291-JAR, claiming a constitutional violation, false imprisonment, and intentional infliction of emotional distress.   While this lawsuit was pending, the former assistant counsel for the Unified Government oversaw the removal of the five warrants intended for Mr. Eacholes from under plaintiff's name in the ALERT system.   In July 2002, the parties settled the lawsuit for $25,000.

In July 2003, an unknown person, possibly Mr. Eacholes, appeared before a municipal court judge on the five misdemeanors for which Mr. Echols had been arrested in February 2000.   The unknown person denied that he was the named defendant.   In response, the court scheduled an identification hearing for August 14, 2003, which was continued until September 11, 2003.   When no one showed up for the hearing, the judge issued new bench warrants on the five misdemeanors.   The incorrect name "Mr. Echols[,] Alonzo" and birth date "2-4-65" still appeared on the face of the tickets and were consequently entered into the ALERT system under the plaintiff's name, Alonzo Echols.

On the afternoon of October 20, 2003, Kansas City, Kansas, police officers responded to an unrelated domestic disturbance call involving Mr. Echols.   The officers arrested Mr. Echols for domestic battery and then discovered that entering his name into the ALERT system resulted in five outstanding bench warrants.   He was taken to the WCDC and booked.

Defendant   Buckner, a deputy in the Wyandotte County Sheriff's Office, was assisting with intake and was the first person to come into contact with Mr. Echols at the jail on October

20, 2003.  Mr. Echols told Mr. Buckner that he understood he had been brought in on the domestic dispute but that the five outstanding bench warrants were mistakenly issued for him, instead of Mr. Eacholes.  Mr. Echols removed a business card from his wallet with the phone number of Caroline Adams ("Ms. Adams"), a private investigator whom Mr. Echols intended to ask to contact the attorney, Nancy Roe ("Ms. Roe"), who had represented him during his earlier mistaken confinement in February and March 2000.  After processing Mr. Echols, Mr. Buckner allowed him to call Ms. Adams, but Mr. Echols did not speak to Roe at that time.  Other than this one conversation with Mr. Echols, nothing in the record establishes that Mr. Buckner was aware that Mr. Echols had filed a lawsuit because of a previous false imprisonment based on mistaken identity.  Also, he did not have any conversation with Mr. Echols after October 20.

Defendant Gilbert was the booking officer that day.  Mr. Gilbert has testified that as the booking officer, he is told 12 to 16 times daily, "You've got the wrong guy."  He also has testified that upon hearing this assertion, he examines the basis for the accusation.  Depending on the information provided, he decides whether to investigate the matter.  That day, Mr. Echols told Mr. Gilbert that the five warrants wrongly listed his name and that he had "settled this with you guys before, these warrants, in a lawsuit" and that Mr. Gilbert needed to "check fingerprints on this other Alonzo Eacholes."  Upon hearing this, Gilbert told Mr. Echols that he would need to talk with the judge about it.  Other than this one statement by Mr. Echols, nothing in the record establishes that Mr. Gilbert knew Mr. Echols had been detained before

4

the year 2003 on warrants issued for Mr. Eacholes.   Further, Mr. Echols did not have any further contact with Mr. Gilbert beyond October 20 while detained at the WCDC.

Defendant Russell was the supervisor of the WCDC on October 20, 2003.  He does not recall being in the intake area of the jail or having any personal involvement in the intake process.   Mr. Russell also does not recall Mr. Echols stating to him or anyone in his presence that he was not the person wanted on the warrants, nor does Mr. Russell recall anyone telling him that Mr. Echols had been detained before based on a mistaken identity.   Nothing in the record establishes that Mr. Russell was aware at the time of Mr. Echols's detention in October and November 2003 that Mr. Echols had brought a prior lawsuit against the Unified Government based upon false imprisonment, and nothing establishes that Mr. Echols ever spoke to Mr. Russell.

Likewise, Mr. Echols does not remember talking to Sheriff LeRoy Green, who has testified that he was not present when Mr. Echols was booked on October 20, 2003.  Similarly, Police Chief Ron Miller testifed that he had no personal familiarity with Mr. Echols's detainment in 2003.   He also has never seen a person's computer or paper file flagged to alert others that there is a problem with mistaken identity.

The next day, on October 21, 2003, Mr. Echols appeared before the Kansas City, Kansas, municipal court judge.   Mr. Echols claims that he told the judge that he was not the person wanted on the warrants, but this plea apparently did not persuade the judge that there was a case of mistaken identity.   Instead, Mr. Echols's trial was scheduled for November 13, 2003.

In addition that day, Mr. Echols's former attorney, Ms. Roe, spoke with a judge and the prosecuting attorney about Mr. Echols's claim of mistaken identity, but this second plea was also unsuccessful.   Mr. Echols returned to confinement awaiting his trial.   Notably, Mr. Echols does not claim he had any contact with any of the named defendants at any point after his two separate opportunities to state his claim of mistaken identity to a judge on October 21, 2003.

Mr. Echols does, however, claim that while he was incarcerated he told seven or eight other deputies at the jail that "you got the wrong guy."   He does not know the names of any of these people and cannot describe them.   While confined, Mr. Echols never asked to talk with a supervisor or filed a written grievance using an Inmate Communication Form, but he does admit knowing that he could do so.   In briefing this motion, Mr. Echols states that he "asked, in writing, that they pull the file that was the subject of the five arrest warrants."   Nevertheless, and as the defendants correctly counter, Mr. Echols does not cite to the record to support this assertion, so the court has no basis to substantiate this statement. D. Kan. Rule 56.1(b).

On November 13, 2003, Mr. Echols appeared before a municipal court judge on the five tickets.   The judge found that Mr. Eacholes was the proper defendant ordered Mr. Echols released.

Regarding damages for his claim for intentional infliction of emotional distress, Mr. Echols claims that his allegedly wrongful incarceration in October and November 2003 have caused him nightmares of being in jail that include loud noises, slamming of doors, screaming, and hollering.   He reports having these nightmares "once in a while" and "every now and then."

6

Mr. Echols also alleges that every day he thinks about what happened to him and is frustrated by being wrongly incarcerated, but he has not sought any counseling or treatment for any emotional distress arising out of his arrest and incarceration in October and November 2003.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).   In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.   *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002).   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."   *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."   *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.   *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).   In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on

an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)); *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190, 1197-98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327 (quoting Fed.R.Civ.P. 1). In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## **ANALYSIS**

**1.      Defendants Have Qualified Immunity Against Mr. Echols's Section 1983 Claim**

**A.      Overview of the Qualified Immunity Standard**

Under section 1983, an official sued in his or her individual capacity has qualified immunity from suit if the official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  This doctrine recognizes the legitimate "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Id.* at 807.  Therefore, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).  *See also Hidahl v. Gilpin County Dep't of Soc. Servs.,* 938 F.2d 1150, 1155 (10th Cir. 1991) (noting the "presumption in favor of immunity for public officials acting in their individual capacities").  "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).  Qualified immunity is not simply a defense to liability; it is an immunity from suit.  *See Douglas* v. Dobbs, 419 F.3d 1097, 1101 (10th Cir. 2005) (if qualified immunity applies, an officer "should not be subject to liability or, indeed, even the burdens of litigation").

Once a defendant asserts qualified immunity, "the burden of summary judgment shifts to the plaintiff, and that burden is 'quite heavy.'" *Rachamim v. Ortiz*, 2005 WL 2093018, *2 (10th Cir. 2005) (quoting *Jantz v. Muci*, 976 F.2d 623, 627 (10th Cir. 1992)).  The court

employs a two-part test.  Under the first part of the test, the court determines whether the facts alleged by a plaintiff, taken in the light most favorable to him or her, show that the conduct of a defendant violated a specific constitutional right.  *Hope v. Pelzer,* 536 U.S. 730, 736 (2002) (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)); *Douglas v. Dobbs*, 419 F.3d 1097, 1100-01 (10th Cir. 2005).  If a plaintiff fails to meet the threshold of demonstrating a specific constitutional violation, "there is no necessity for further inquiries" and the analysis ends. *Saucier,* 533 U.S. at 201.  If a plaintiff's factual allegations do amount to a violation of a specific constitutional right, however, "the next, sequential step is to ask whether the right was clearly established at the time of the defendant's unlawful conduct such that a reasonable person in the defendant's position would have known that the alleged conduct violated the federal right." *Id.*

**B.      Specific Application to the Defendants**

Because Mr. Echols has failed to demonstrate a specific constitutional violation by any of the defendants, the court's inquiry stops after the first part of the two-part qualified immunity test.  Under the law of the Tenth Circuit, there is no constitutional violation in this case because a police officer has no duty to investigate a detained prisoner's claim of innocence if the prisoner was arrested on a facially valid warrant.  In the end, Mr. Echols's section 1983 claim fails to recognize the separate roles played by law enforcement officials, prosecutors, and the judiciary.  So long as a judge was aware that Mr. Echols potentially was being detained because of a mistaken identity, there is no basis to impose liability against any of the police officers.  And because Mr. Echols's own brief confirms that he had two separate

chances to state his claim to a judge the day <u>after</u> he spoke to any of the named defendants, the defendants' motion for summary judgment on the section 1983 claim must be granted.[2]

On October 21, 2003, the day after he was arrested and jailed at WCDC, Mr. Echols appeared before a judge.  At that time, he alleges that he told the judge that the police had mistakenly arrested him instead of Mr. Eacholes.   Apparently, the judge was unconvinced, as Mr. Echols was ordered back to his cell and a trial was set for November 13, 2005.  In addition, Mr. Echols's former attorney, Ms. Roe, also pled to the court Mr. Echols's case of mistaken identity later that day.   Plaintiff's brief includes the following affidavit submitted by Ms. Roe:

 1.  In October 2003, I became aware that Alonzo Echols was, for the second time, being held in the Wyandotte County Detention Center for warrants that had been issued for Alonzo Eacholes.[3]

 2.  On or about October 22, 2003, I appeared in Kansas City, Kansas Municipal Court to determine if there had again been a case of mistaken identity concerning Alonzo Echols.

 3.  I spoke with Deputy Rick Martin.  I explained to Deputy Martin about the previous case of mistaken identity and requested that he please check and see if the wrong person was being held again.

---

[2]   Plaintiff has sued Leroy Green, the Wyandotte County sheriff, and Ron Miller,  the Kansas City, Kansas, police chief, in their "official" capacities.   However, "[a] suit against a city official in his official capacity is no different from a suit against the City itself." *Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995) (citing *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989)).   The court finds that there was no constitutional violation against Mr. Echols by any of the defendants, regardless of their capacities.  Upon this finding, there can be no municipal liability under section 1983.  *See, e.g.*, *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155-56 (10th Cir. 2001).

[3]   This assertion is incorrect.   Although the plaintiff alleges that his name was improperly listed on the warrants, the warrants nevertheless were issued under the name Alonzo Echols.

4.      Deputy Martin left the courtroom for approximately ten to fifteen
minutes and when he returned, he informed me that it appeared the wrong
person was in custody.

5.      I spoke with the prosecuting attorney and the judge about this matter and
Deputy Martin's findings.

6.      It was my impression when I left the courtroom that day that everyone
understood a mistake had been made and that Alonzo Echols was to be
released immediately.

Although this result was unfortunate, the defendants could not have altered it.  Not only

did Mr. Echols appear before a judge the day after he was arrested, but his former attorney

raised the issue for a second time with both the prosecuting attorney and a judge.  And this

second independent judicial evaluation occurred only because Deputy Martin actively

investigated the matter by leaving the courtroom and returning with the prosecuting attorney

and a judge.

The timing of these two judicial evaluations is important–both occurred the day after

Mr. Echols spoke with any of the defendants.  Indeed, the facts show that the defendants each

only had one conversation with Mr. Echols–on October 20.  Thus, even if the court accepts that

the officers had a duty to investigate his innocence, the timing of the events in this case

forecloses any section 1983 liability against the defendants.  Had they done as Mr. Echols

alleges they should have, the result would have been the same: Mr. Echols would have received

an informal hearing before the judge and the prosecuting attorney.  That is exactly what

occurred in this case, so the court finds no liability under section 1983 against the defendants.

A further examination shows that Mr. Echols received far more than he was constitutionally due. In *Brady v. Dill*, 187 F.3d 104 (1st Cir. 1999), the court examined a section 1983 claim with facts similar to the facts in this case. The plaintiff in *Brady* had been arrested on a facially valid warrant and sued the police officers who detained him despite his plea of innocence based on mistaken identity. In rejecting the plaintiff's claim, the court initially held that because the arrest and detention were based on a facially valid warrant, the Fourth Amendment did not apply. *Id.* at 110 (citing *Baker v. McCollum,* 443 U.S. 137 (1979)). Thus, the plaintiff's claim collapsed to substantive due process and the issue became whether the plaintiff's "post-arrest procedural guarantees were abridged." *Id.* at 108. To prevail, a plaintiff "must do more than show that the troopers made a mistake." *Id.* (quoting *Baker*, 443 U.S. at 145 (treating the fact that the plaintiff was actually innocent of the charges underlying the warrant as "largely irrelevant to his claim of deprivation of liberty without due process.")).

In evaluating the claim under substantive due process, the court held that the separation of roles precluded any liability against the police officers. As the Supreme Court in *Baker* insisted, the "ultimate determination of claims of innocence" are "in the hands of the judge and the jury." 443 U.S. at 146. This distinction is critical, as *Baker* accepted that a "reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers" is "entirely consistent with due process of law." *Id*. at 145. Focusing on this language, the court in *Brady* emphasized that "respect for the separation of functions . . . largely explains why the *Baker* Court declined to impose on police officers an affirmative duty

of investigating claims of innocence.  The same principle also bears on why the Court deemed adherence to the archetypal post-arrest due process guarantees sufficient to protect McCollan's rights (and, ultimately, to defeat his section 1983 claim)." *Brady*, 187 F.3d at 111.  Ultimately, when a plaintiff is arrested on a facially valid warrant, "it is surpassingly difficult to fathom why the proper method of challenging the ensuing detainment should be something more than a prompt hearing before a magistrate." *Id*. at 114.  Because that occurred in this case–in fact, it occurred twice on October 21 and the second time with counsel present–Mr. Echols's section 1983 claim must fail.

Guidance by the Tenth Circuit confirms this court's proper reliance on *Brady* and *Baker*.  In fact, the First Circuit in *Brady* relied upon the Tenth Circuit's decision in *Romero v. Fay*, 45 F.3d 1472 (1994).  In *Romero*, the Tenth Circuit rejected the plaintiff's section 1983 claim that the police unconstitutionally refused to release him despite his plea of innocence.  The arrest in *Romero* was not based on a warrant, yet the Tenth Circuit reflected the *Baker* Court's "recognition that the judicial system represents the proper forum in which to determine the innocence of an arrestee." *Id*. at 1481.  *See also Brady*, 187 F.3d at 111 (finding that if the rule against imposing a constitutional duty on the police "applies to a warrantless arrest, it must apply, *a fortiori*, to an arrest of a person named in a facially valid warrant."). *Cf. Davis v. Gracey*, 111 F.3d 1472, 1484-85 (10th Cir. 1997) ("We hold that the officers' reliance on a valid warrant entitled them to qualified immunity on plaintiffs' Fourth Amendment claim, and established a good faith defense. . . .").

14

Although the police officers' conduct might not have been ideal, the Tenth Circuit concluded in *Romero*:

> With the benefit of hindsight, it may have been fruitful for Defendants to investigate Plaintiff's alibi witnesses, or to attempt to contact individuals. . . . The essence of Plaintiff's argument, however, is that the police assumed a duty to conduct a post-arrest investigation which they performed poorly. Although Defendants may not have conducted their post-arrest investigation as efficiently as possible, their conduct as alleged by Plaintiff simply does not exceed negligence. Plaintiff has therefore failed to assert a constitutional violation at all.

*Id*. at 1479.

The Tenth Circuit's decision in *Scull v. New Mexico*, 236 F.3d 588 (10th Cir. 2000), extended the scope of its holding in *Romero*. Admittedly, it might be argued that in *Romero* and the other cases the section 1983 plaintiff was only detained a few days before he was released, and that this shorter time frame is a material distinction to Mr. Echols's claim because he was detained for 25 days, far longer than a few days. However, in *Scull*, the section 1983 plaintiff was detained 30 days, yet the Tenth Circuit still found no constitutional violation because there was no underlying duty by the police to investigate the plaintiff's claim of innocence. *See id.* at 598. Given this Tenth Circuit precedent, Mr. Echols fails to allege any constitutional violation against any of the defendants, including Deputy Martin.

Mr. Echols makes a cursory attempt to argue that the police had a policy or custom, or they failed to train their officers to investigate claims of innocence. This argument, however, ignores the established rule in the Tenth Circuit that to hold a supervisor or a municipality liable, the section 1983 plaintiff must identify a predicate constitutional violation. As the undersigned recently observed in *Sudac v. Hoang*, 378 F. Supp. 2d 1298 (D. Kan. 2005), the

15

failure to allege an underlying violation by any of the police officers precludes any claim against the chief of police, the police department, or the municipality. *Id*. at 1311. *See also Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004) ("[W]hen a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation-- i.e., the first step of the qualified immunity analysis--a finding of qualified immunity *does* preclude the imposition of municipal liability."); *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155-56 (10th Cir. 2001) (same). As a result, Mr. Echols's claims against the Unified Government, Sheriff Green, and Chief Miller all fail as well.

**2.    Statute of Limitations**

In addition, defendants Buckner, Gilbert, and Russell are not liable on the false imprisonment claim because they were not sued before the statute of limitation expired.[4] The parties dispute whether Mr. Echols has properly amended his complaint under Federal Rule of Civil Procedure 15(c)(3), but Mr. Echols never even attempts to rebut the defendants' argument or authority. The law in the Tenth Circuit does not allow a plaintiff to file a "John Doe" pleading and then amend the complaint to add newly named defendants. The court need not continue: "[a] plaintiff's designation of an unknown defendant as 'John Doe' in the original

---

[4] In addition to defendants Buckner, Gilbert, and Russell, Mr. Echols also sued the Unified Government, as well as Mr. Green and Mr. Miller in their "official" capacities. However, "[a] suit against a city official in his official capacity is no different from a suit against the City itself." *Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995) (citing *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989)). Thus, the claims against Mr. Green and Mr. Miller are dismissed as duplicative, and Unified Government is the only remaining defendant under the false imprisonment claim.

16

complaint is not a formal defect of the type Rule 15(c) was meant to address.  We therefore hold that the district court did not err by holding that [plaintiff's] amended complaints did not relate back to the date of his original complaint."  *Garrett v. Fleming*, 362 F.3d 692, 697 (10th Cir. 2004).  Because Mr. Echols makes no attempt to distinguish *Garrett*'s holding from foreclosing his amended claims, the court finds that the false imprisonment claims against defendants Buckner, Gilbert, and Russell are barred under Kansas's one-year statute of limitation.  *See* K.S.A. 60-514(b); *Henry v. F.D.I.C.*, 168 F.R.D. 55, 59 (D. Kan 1996).[5]

**3.      Intentional Infliction of Emotional Distress**

Kansas recognizes the tort of intentional infliction of emotional distress.  *Sawyer v. Southwest Airlines Co.*, 243 F.Supp.2d 1257, 1273 (D. Kan. 2003).  To establish a claim, a plaintiff must satisfy all four of the following elements: (1) conduct by the defendant in intentional or reckless disregard of the plaintiff; (2) extreme and outrageous conduct; (3) a causal connection between the defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress was extreme and severe.  *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman,* 267 Kan. 245, 257 (1999)).[6]

---

[5] Even if the court were incorrect in its statute of limitation analysis as to defendants Buckner, Gilbert, and Russell, Mr. Echols nevertheless conceded that the three defendants should be granted summary judgment on his false imprisonment claim because they were legally justified in detaining him based on facially valid arrest warrants.  Mr. Echols never challenged that the five arrest warrants were entered into the ALERT system under Mr. Echols's name.

[6] Intentional infliction of emotional distress is the same under Kansas law as the tort of outrage.  *Hallam v. Mercy Health Center*, 278 Kan. 339 (2004).

The defendants have argued that Mr. Echols failed to produce any evidence to establish the first, second, and fourth elements.  In his response brief, Mr. Echols only addressed the fourth element.  Mr. Echols's claim fails to establish the first element because, incorporating its above analysis under the qualified immunity issue, the court does not find that any of the defendants, including Mr. Martin, acted in intentional or reckless disregard of Mr. Echols.  *See Romero v. Fay*, 45 F.3d 1472, 1481 (10th Cir. 1995) ("Defendants' refusal to release Plaintiff when he maintained his innocence does not exhibit deliberate or reckless intent. . . .); *Clevenger v. Catholic Social Service of Archdiocese of Kansas City in Kansas, Inc.*, 21 Kan. App. 2d 521, 536 (1995) ("We conclude that a record which requires an inference of malice merely . . . from negligence in the reporting and investigation of the information is not sufficient to withstand a motion for summary judgment.").  Even if the defendants were "grossly negligent" in their conduct, this would not be enough to meet the threshold of intentional or reckless conduct.  *See Woodward v. City of Worland*, 977 F.2d 1392, 1399 n.11 (10th Cir. 1992) ("Merely characterizing the negligence as 'gross' does not change its essential character. Negligence is carelessness and gross negligence is simply gross carelessness. Neither simple nor gross negligence implies an intentional and deliberate violation. . . .").  Consequently, given the total absence by Mr. Echols to allege any specific intentional or reckless conduct within this claim, the court grants the defendants' motion to dismiss the claim for intentional infliction of emotional distress.

**4.      Conclusion**

In the end, the plaintiff's claims against Mr. Buckner, Mr. Gilbert, Mr. Green, Mr. Martin, Mr. Miller, and Mr. Russell are all dismissed.  Except for the claim of false imprisonment, the claims against Unified Government are dismissed as well.


**IT IS THEREFORE ORDERED BY THE COURT** that the defendants' motion for partial summary judgment (doc. #50) is granted.

**IT IS FURTHER ORDERED BY THE COURT** that defendant Rick Martin's motion for summary judgment (doc. #53) is also granted.


**IT IS SO ORDERED** this 15th  day of November, 2005.


s/ John W. Lungstrum

John W. Lungstrum

United States District Judge